James BINION, Sheridan Clark, Willie Cousins, and Oddie Greene, Plaintiffs,

v.

METROPOLITAN PIER AND EXPOSITION AUTHORITY, Defendant.

No. 94 C 3814.

United States District Court, N.D. Illinois, Eastern Division.

Sept. 12, 1995.

Stephen G. Seliger, Seliger & Mikva, Ltd., Chicago, IL, Marshall Patner, Marshall Patner & Associates, P.C., Chicago, IL, Peter Robert Sonderby, Peter R. Sonderby, P.C., Chicago, IL, for plaintiffs.

Thomas G. Abram, Michael Paul Nicolai, Vedder, Price, Kaufman & Kammholz, Chicago, IL, for defendant.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

This employment discrimination case is before the Court on the Plaintiffs' motion to certify the class. At issue is whether the Plaintiffs have shown commonality and typicality under Rule 23(a)(2–3) of the Federal Rules of Civil Procedure. Also at issue is whether an earlier Equal Employment Opportunity Commission charge not filed by one of the named Plaintiffs opens the class membership period. For the reasons stated below, we grant the Plaintiffs' motion. We hold that the Plaintiffs have shown commonality and typicality, and that the earlier filed charge opens the class membership period.

### I.

### A.

 When a claim for relief involves issues of law or fact common to a class of persons, and when the issues center on questions of law applicable in like manner to each member of the class, class relief is "peculiarly appropriate." *See General Telephone Company of the Southwest v. Falcon,* 457 U.S. 147, 155, 102 S.Ct. 2364, 2369, 72 L.Ed.2d 740 (1982); 7A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, §§ 1751–1764. Rule 23 of the Federal Rules of Civil Procedure governs the standards for certifying a class. It is well settled that the party requesting class certification has the burden of showing the four requirements for certification within Rule 23(a) of numerosity, commonality, typicality, and adequate representation. *See General Telephone Co.,* 457 U.S. at 157–58, 102 S.Ct. at 2371. In looking to the movant's proofs, we do not have " 'any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.' " *Meiresonne v. Marriott Corp.,* 124 F.R.D. 619, 622 (N.D.Ill.1989) (Shadur, J.) (quoting *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974)). Accordingly, "[s]ometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification issue." *General Telephone Co.,* 457 U.S. at 160, 102 S.Ct. at 2372. The standard of proof required, then, in support of certification is rather liberal and subject to our discretion. *See Patterson v. General Motors Corp.,* 631 F.2d 476, 480 (7th Cir.1980), *cert. denied,* 451 U.S. 914, 101 S.Ct. 1988, 68 L.Ed.2d 304 (1981). In counterpoint to the liberal certification standard, as developments in the class litigation occur, a court remains free to modify or vacate a certification order if it should prove necessary. *General Telephone Co.,* 457 U.S. at 160, 102 S.Ct. at 2372.

### B.

The Metropolitan Pier and Exposition Authority ("Metro Pier") is a municipal corporation that manages convention and exposition activities at Chicago's Navy Pier and McCormick Place. Their Housekeeping Department contains about three hundred employees, most of whom hold the unofficial job title of "janitor." About half of the janitors are African American, about a third are hispanic, and the rest belong to other ethnic groups. The Housekeeping Department has three classifications of positions. Positions are classified either full time, part time, or temporary. Full time employees receive full benefits and typically work forty or more hours per week. Part time employees do not usually receive benefits. They work up to thirty-two hours per week. Temporary employees do not receive benefits. They work only up to sixteen hours per week.

Seniority, the amount of time spent with the company, is the exclusive guidepost for determining who is promoted from temporary to part time, or from part time to full time status. Seniority within a classification also determines who receives assignments when there are more employees willing to work than there are positions. Thus the full time Housekeeping staff consists of those

employees who have worked with Metro Pier the longest without quitting, dying, or being fired. Likewise, the part time Housekeeping staff consists of the next senior rung of employees who have stayed on. Temporary Housekeeping staff are those with the lowest seniority. All employees begin as temporary staff.

Supervisory staff members enforce the disciplinary rules. The supervisory hierarchy in the Housekeeping Department contains a handful of managerial staff, including assistant foremen, foremen, assistant head foremen, head foremen, an assistant superintendent, and a superintendent. The superintendent is the only manager in the Department authorized to make final disciplinary and discharge decisions. Unless a disciplinary matter is "unusual," he does not need to consult with his direct supervisor, the Operations Manager, on these decisions.

Since 1986, Metro Pier's Housekeeping Department has enforced a written, progressive disciplinary policy which divides infractions into two categories: major and minor. One committing a major infraction is subject to immediate suspension or discharge without advanced notice or warning. Such infractions include theft, endangering people's safety, arriving at work under the influence of alcohol or narcotics, and so on. One committing a minor infraction is entitled to progressive discipline. On the first offense, a supervisor will give an oral warning; on the second offense, a written warning; on the third, suspension number one; on the fourth, suspension number two; and on the fifth offense, the employee will be discharged. Minor infractions include offenses such as tardiness, insubordination, improper dress, unexcused absence without calling in, and so on.

We are not the first court, or even the second, to have before it the allegations presented by the Plaintiffs. Therefore, a short procedural history is in order. On July 22, 1991, a black employee in the Housekeeping Department at Metro Pier, Jetun Jefferson ("Jefferson"), filed a *pro se* claim with the Equal Employment Opportunity Commission ("the EEOC"), alleging that he was subject to discrimination at work on the basis of his race and sex. In his race discrimination claim, he alleged unequal employment opportunities in transfers, in hours, and in assignments as an unscheduled walk-in. He also alleged being subject to racial slurs. In his sex discrimination claim, he alleged that women with lower seniority were being promoted while he was not. His charge stated in paragraph four, "I believe that Blacks are discriminated against as a class...." (Pl.'s Ex. 20).

The July 22 filing was apparently the first of three complaints that Jefferson filed with the EEOC on similar, but not identical, sets of allegations. On July 29, 1991, Jefferson filed a second, more detailed complaint listing in several particulars the verbal abuse, racial harassment, denial of terms of employment, and unequal disciplinary treatment he and other blacks allegedly endured at Metro Pier. Notably, this complaint includes the following allegations:

C. In November or early December, 1990, I was suspended although I never threatened [supervisor] Greenwood. Nonblacks (names unknown) are not suspended even if they threaten supervisors.

* * * * * *

E. Respondent [Metro Pier] has even threatened to fire the 50 most senior employees (mostly black), to improve the seniority status of non-blacks.

(Pl.'s Ex. 20). On August 28, 1991, Jefferson filed a third EEOC complaint, which alleges that black males with greater seniority are given fewer work hours and are not allowed to transfer. He left unspecified in this complaint over whom the black males had seniority.

The EEOC investigation encompassed review of all disciplinary records for employees in Metro Pier's Housekeeping Department. After investigation, the EEOC decided not to sue on Jefferson's behalf, but did give him a right-to-sue letter to file an action in federal district court. He filed a *pro se* complaint that was placed on Judge Shadur's docket as 92 C 6770. Judge Shadur appointed counsel. As discovery progressed, counsel for Jefferson obtained evidence seeming to imply classwide discrimination. Counsel assembled

statistics which purport to show that discharges in the Housekeeping Department occurred out of proportion to the relative numbers of blacks and hispanics. According to these statistics, when 54.8% of Housekeeping employees were black and 28.8% were hispanic, 76.6% of discharges were of blacks and 12.0% were of hispanics. The following table summarizes the year-by-year percentages and standard deviations presented by the Plaintiffs in the appendix to their present motion.

| | | % of Employees | % of Discharges | S. Deviation[1] |
|---|---|---|---|---|
| 1986 | | | | |
| | Blacks | 52.9% | 51.8% | 0.16 |
| | Hispanics | 26.5 | 3.7 | 2.87 |
| 1987 | | | | |
| | Blacks | 53.7 | 76.5 | 2.66 |
| | Hispanics | 30.4 | 2.9 | 3.48 |
| 1988 | | | | |
| | Blacks | 53.6 | 59.0 | 0.47 |
| | Hispanics | 30.4 | 27.9 | 0.11 |
| 1989 | | | | |
| | Blacks | 58.1 | 81.1 | 6.10 |
| | Hispanics | 26.7 | 11.9 | 4.49 |
| 1990 | | | | |
| | Blacks | 56.2 | 81.0 | 6.34 |
| | Hispanics | 29.1 | 10.5 | 4.99 |
| 1991 | | | | |
| | Blacks | 55.6 | 80.6 | 4.07 |
| | Hispanics | 28.3 | 11.3 | 2.95 |
| 1992 | | | | |
| | Blacks | 54.3 | 78.6 | 4.06 |
| | Hispanics | 27.9 | 8.6 | 3.69 |
| 1993 | | | | |
| | Blacks | 54.6 | 75.0 | 2.22 |
| | Hispanics | 29.1 | 14.3 | 1.78 |
| Total 1986–93 | | | | |
| | Blacks | 54.8 | 76.6 | 10.68 |
| | Hispanics | 28.8 | 12.0 | 9.07 |

(Pl.'s Ex. 7). We pass no judgment on the accuracy of these figures or on the methods used to create them. We rather list them to note that counsel presented these figures as representative of a statistically significant difference from the result that would occur if disciplinary decisions had been race neutral.

In addition to statistical information, depositions of James Binion, Sheridan Clark, Willie Cousins, and Oddie Greene contributed to Jefferson's case testimony alleging classwide discrimination on the part of Housekeeping supervisors. Within two weeks of compiling the statistics, counsel for Jefferson fashioned a third amended complaint to join Binion, Clark, Cousins, and Greene in his action. Counsel requested leave to file the third amended complaint and requested leave to file a motion to certify the class based on

---

**1.** The Plaintiffs state that a standard deviation of 1.96 or more indicates a statistically significant difference from a race neutral hypothesis. Standard deviation is one of several indicators of statistical significance that plaintiffs in employment discrimination cases might use. Others include p-tests (one- and two-tailed) and regression analyses. We express no opinion here which test is appropriate in a given situation. *See* Walter B. Connolly, Jr., *et al.*, *Use of Statistics in Equal Employment Opportunity Litigation* §§ 6.01–6.05 and §§ 11.01–11.12 (1992).

Jefferson and the above named Plaintiffs as representatives.

On May 17, 1994, Judge Shadur denied both requests in open court. He reasoned that Jefferson's original *pro se* EEOC filing failed to state explicitly that he would attempt to represent a class. Allowing the third amended complaint containing four additional plaintiffs in his opinion would distort the class membership period by allowing membership based on Jefferson's individual discrimination complaint. In addition, discovery had closed in Jefferson's case and the deadline for submission of the pretrial order was only a month away. Judge Shadur reasoned that reopening discovery would result in undue delay in resolving Jefferson's individual claims. Judge Shadur stated that his ruling was without prejudice with regard to any independent action. He invited Jefferson's counsel to file separately a different case if they were still interested in pursuing a class action.

By random assignment, Jefferson's case was transferred to Judge Castillo upon his appointment to the bench. On June 22, 1994, Jefferson's counsel renewed the requests that Judge Shadur had denied. Judge Castillo denied them as well, stating that he agreed with the reasoning of Judge Shadur and that he was disinclined to alter the prior ruling of any judge in the cases assigned to his new docket. That same day, Binion, Clark, Cousins, and Greene ("the Plaintiffs") filed the present action. Jefferson settled the 92 C 6770 action in September 1994. In the settlement agreement, Jefferson dropped his sex discrimination claims but reserved the right to join the present suit as a potential class member in his race discrimination claims.

## II.

We are asked to decide whether the Plaintiffs have shown that their class claims satisfy the commonality and typicality requirements of Rule 23(a) of the Federal Rules. If so, then we must decide the appropriate dates for class membership in both the Title VII and the Section 1981 claim.

## A.

In order to support a motion for class certification, a party requesting certification, here the Plaintiffs, must show that there exists a common nucleus of operative facts. *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992), *cert. denied sub nom. Livaditis v. Rosario,* —— U.S. ——, 113 S.Ct. 972, 122 L.Ed.2d 127 (1993); *Jaroslawicz v. Safety Kleen Corp.,* 151 F.R.D. 324, 327 (N.D.Ill. 1993). Put another way, the Plaintiffs must show that at least one issue of law or fact exists which is common to all the class members. *Meiresonne,* 124 F.R.D. at 622.

The Plaintiffs argue that they have shown sufficient facts to support commonality. In their complaint, the Plaintiffs allege disparate treatment and disparate impact in terms and conditions of employment for black employees of Metro Pier in violation of Title VII of the Civil Rights Act of 1964, as amended. The Plaintiffs also allege wilful disregard of the Plaintiffs' rights under 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991. Both the Title VII and the Section 1981 claims are based on allegedly disparate application of Metro Pier's progressive disciplinary policy. The Plaintiffs point out that in the relevant time period, Metro Pier used a centrally administered discipline policy applied to all Housekeeping employees. They present testimony showing that a single person was finally responsible for almost all decisions involving discipline and discharge. The Plaintiffs identify employment statistics which show that between 1986 and 1993, when black janitors made up between 50% and 55% percent of the housekeeping workforce, nearly 77% of the discharges were of black employees. The Plaintiffs identify similar statistics suggesting that 92% of those discharged for theft or attempted theft were black. They also present statistics suggesting that disciplinary action that does not lead to discharge is applied in a discriminatory manner against blacks. In addition to the numbers, the Plaintiffs present deposition testimony of five present or former black employees alleging that supervisory personnel discriminate against blacks and in favor of hispanics in disciplinary decision making.

Metro Pier responds that the foregoing fails to allege sufficient facts to show commonality. They argue that merely alleging a general policy of discrimination or harassment does not suffice. They state that the named Plaintiffs' deposition testimony belies the assertion of a centrally and uniformly administered disciplinary policy because the Plaintiffs complain of the initiation of discipline by many different supervisors. These line supervisors might have had their own personal reasons for harassing them. Thus, litigation of the Plaintiffs' and the class claims would focus on unique circumstances for each claim, requiring this Court to entertain a series of "mini-trials." They argue that the presentation of the statistics showing disparities in discharge rates is unavailing. Citing *Coates v. Johnson & Johnson*, 756 F.2d 524, 542–43 (7th Cir.1985), they claim that a comparison of discharge rates alone will be meaningless at trial unless accompanied by an explanation of the number and severity of disciplinary warnings received by individual employees.

■ Metro Pier's argument is flawed for several reasons. First, even if personal grudges by line supervisors account for some disciplinary actions, this does not mean the absence of a common issue of law or fact. *See* Fed.R.Civ.P. 23(a)(2). If a class certification can be overcome simply by asserting that line supervisors might have personal reasons to dislike their workers, then no class action could ever challenge the disciplinary policy of a large organization like Metro Pier. In this case, one supervisor bears ultimate responsibility for all disciplinary decisions. Needless to say, he cannot be everywhere at once at all times. Someone has to apply the disciplinary policy in the first instance. If that policy is indeed discriminatory, then line supervisors will almost necessarily apply it with discriminatory effect, grudge or no grudge.

In a like manner, Metro Pier asks us to extend too far the Seventh Circuit's holding in *Coates* concerning the use of statistical evidence. There the question was how should a trial court allocate the burden of persuasion when a plaintiff charges that a neutral explanation for discrimination is itself infected with bias. *Id.* at 543. They concluded that when a defendant presents statistical evidence that the alleged victims of discrimination were in fact poor workers or disciplinary problems, the plaintiff bears the burden of showing that this evidence is itself an outgrowth of the employer's discriminatory actions. *Id.*

*Coates* is distinguishable because it concerned statistical evidence presented by a defendant, not a plaintiff. Further, *Coates* involved a plaintiff's burden for showing bias in the defendant's rebuttal evidence, not the plaintiff's burden in establishing a prima facie case. If we were to extend *Coates* in this way, we would unfairly discredit the probative value of a statistical showing used to support a claim of commonality under Rule 23(a)(2). To state a hypothetical case, imagine a large workforce of 50% blacks and 50% whites, where 100% of a statistically significant number of discharges in a period were of blacks only. We think it contrary to reason to say that even a massive statistical disparity in rates of discharge cannot imply a common nucleus of operative facts or a single issue of law in a prima facie case. While it may be true that each discharge of a black employee would bring into court a different set of circumstances, those circumstances might all depend upon the policies under challenge as discriminatory. The Plaintiffs here have more than simply alleged a general policy of discrimination. They have provided testimony and statistical evidence showing the operation and effect of an identifiable, written, and possibly discriminatory disciplinary policy. Metro Pier is premature in arguing that every claim will prevail or not on entirely independent facts.

*B.*

■ Whether the Plaintiffs' claims are typical of those of the members of the putative class presents a different but related question. Typicality generally requires that the claims of the plaintiffs stand or fall on the same facts as the claims of the putative class members. *See East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977). Typicality "does not require that the

claims or defenses of the class representatives be identical or perfectly coextensive with the claims or defenses of the members; substantial similarity is satisfactory." *Allen v. Isaac,* 99 F.R.D. 45, 54, *order amended,* 100 F.R.D. 373 (N.D.Ill.1983).

The Plaintiffs argue that the named representatives have claims which are typical of the class: they have all been disciplined because of race, and only one of the four has been advanced to a full time job. Plaintiff Binion testified he was fired for allegedly attempting to steal a VCR, while an hispanic worker's discharge for stealing a camera was rescinded when that worker brought in a doctor's note. (Pl.'s Ex. 16 at 50). Plaintiff Clark testified he was among a group of eight employees, six black and two hispanic, a few minutes late at the fault of a supervisor, but the blacks were written up and the hispanics were not. (Pl.'s Reply at 4). Plaintiff Cousins testified he is still employed with Metro Pier, but was improperly harassed by his supervisor. (*Id.*). Plaintiff Greene testified of discipline imposed because of his race. He also testified that the Superintendent of Housekeeping told him, "I hire black people and y'all can't do anything. He said y'all don't do any work around here.... I might as well just fire all of you and just get hispanics, at least they'll do the work." (Pl.'s Ex. 15 at 48).

Metro Pier responds that the named Plaintiffs' claims have little to do with each other or with those of the putative class members. Metro Pier argues that Plaintiff Binion does not challenge any formal discipline he received except for his discharge. As for the incident with the hispanic employee, the disparate treatment might have been motivated by simple favoritism because the employee was the brother of the supervisor who allegedly caught him. (Def.'s Response at 3). Plaintiff Clark was discharged because he injured a co-worker with a carton cutter while engaged in horseplay, and both he and the hispanic co-worker were fired. (*Id.*). Plaintiff Cousins does not complain of discipline at all, but rather of close supervision and the threat of discipline. (Def.'s Response at 3–4). Plaintiff Greene testified that he was fired because his direct supervisor did not like him for personal reasons. (Def.'s Response at 4). Finally, about 70% of discharges appear to be for attendance reasons, a reason not applicable to those of the three discharged named Plaintiffs. (Def.'s Ex. I).

As the primary authority for their assertion that the Plaintiffs have not met the typicality requirement, Metro Pier cites *Patterson v. General Motors Corp.* In *Patterson,* a black former employee of the General Motors Corporation alleged, among other things, that the defendant replaced him with a less senior white worker, that he was harassed for seeking redress of his grievances, and that he was improperly summoned early from medical leave. *Patterson,* 631 F.2d at 479. The Court of Appeals affirmed the denial of class certification by the district court, stating, "plaintiff in this case has simply asserted no facts relating to other members of the purported class." *Id.* at 481. Similarly, because the plaintiff in *Patterson* had given no information about possible claims of putative class members, the court stated that its inquiry into typicality was "severely limited." *Id.*

On the issue of typicality, *Patterson* and its progeny are distinguishable from the facts presently before us. *See Resnick v. American Dental Association,* 90 F.R.D. 530, 536–38 (N.D.Ill.1981) (Shadur, J.) (distinguishing *Patterson* ). The *Patterson* opinion included the following facts supporting denial of the plaintiff's motion for class certification.

> [E]xcept for his assertion that he was filing suit on behalf of all minority workers at GM, plaintiff's complaint was not framed in class action terms at all. Although he did state that the defendants' discriminatory policies adversely affected the purported class, he nowhere substantiated that claim with any factual allegations of classwide discrimination.

*Patterson,* 631 F.2d at 480. Nonetheless, Metro Pier has asked us to consider several district court cases purporting to follow the reasoning in *Patterson. See Brown v. National R.R. Passenger Corp.,* 1988 WL 76935, at *7 (N.D.Ill. July 15, 1988); *Israel v. National R.R. Passenger Corp.,* 1987 WL 18373 (N.D.Ill. Oct. 5, 1987); *Henderson v. Nation-*

*al R.R. Passenger Corp.,* 117 F.R.D. 620, 622–23 (N.D.Ill.1987); *Hall v. American Bosch Div. of AMBAC Industries, Inc.,* 40 F.E.P. Cases 853 (D.Mass.1986).

The district court cases cited by Metro Pier fall within the *Patterson* holding because the plaintiffs there failed to connect their own claims in any way to the claims of the putative classes. For instance, in *Hall,* none of the proposed class representatives complained of disciplinary actions connected to an identifiable written policy which favors one racial group over another. *Hall,* 40 F.E.P. Cases at 855. In *Israel,* the plaintiff did not allege with particularity a " 'specific discriminatory policy and the purported consequences of that classwide discrimination.' " *Israel,* 1987 WL 18373, at *3 (quoting *Resnick,* 90 F.R.D. at 537). In *Brown,* the plaintiff presented no statistics and identified no written policy of the employer that would connect his claim to those of the putative class members. *Brown,* 1988 WL 76935, at *3–*4.

■■■ Taken together, the Plaintiffs' claims in this case state claims that are typical of the class. The Plaintiffs have not merely alleged discriminatory discipline based on race. They have alleged specific instances where identical rule infractions have resulted in harsher penalties for blacks than for hispanics—exactly the facts which would support a class charge of discrimination. The group of four named Plaintiffs includes those who would make claims on behalf of those discharged from Metro Pier, on behalf of those receiving discipline short of discharge, and on behalf of those still employed with Metro Pier. The Plaintiffs have buttressed their allegations with a statistical showing of apparent differences in the discharge and discipline rates of blacks relative to hispanics. Further, the Plaintiffs were subject to the same written disciplinary policy administered by the same superintendent at the same facility as the putative class members. Metro Pier's characterization of the disciplinary incidents as personal and not official goes to the merits of the individual claims rather than the question of whether those claims are typical of those of the class. Further, it is for the trier of fact to assess whether

discharges based on attendance did or did not represent discriminatory enforcement of the written disciplinary policy. *See Eisen,* 417 U.S. at 177, 94 S.Ct. at 2152. For the foregoing reasons, the Plaintiffs have met the commonality and typicality requirements of Rule 23(a)(2–3).

## C.

■■■ We now must decide the beginning date of class membership. At issue is whose charge is the earliest filed charge relevant to the classwide allegations at bar: Jefferson's 1991 EEOC filing or the 1994 EEOC filings of Plaintiffs Binion, Clark, Cousins, and Greene. In a class action brought under Title VII, the beginning of the class membership period is the same as the beginning of the limitation period for the relevant classwide allegations. *Movement for Opportunity and Equality v. General Motors Corp.,* 622 F.2d 1235, 1248 (7th Cir. 1980); *Allen,* 99 F.R.D. at 50. In general, an individual has 300 days from the date of an alleged injury within which to file a charge of employment discrimination under Title VII with the EEOC. 42 U.S.C. § 2000e–5(e)(1); *see Allen,* 99 F.R.D. at 50. Therefore, the class membership period "will commence 300 days prior to the earliest charge filed relevant to a particular class claim." *Movement for Opportunity and Equality,* 622 F.2d at 1248; *see Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 246 (5th Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). The law concerning suspension of limitation periods on classwide allegations is well settled. It remains for us to determine only to what extent this law applies to the situation before the Court.

In *American Pipe and Construction Co. v. Utah,* the Supreme Court held that the limitation period on a classwide allegation is suspended upon the filing of a class action complaint for all putative class members who make a timely motion to intervene upon denial of class certification. *American Pipe and Construction Co. v. Utah,* 414 U.S. 538, 552–53, 94 S.Ct. 756, 765–66, 38 L.Ed.2d 713 *reh'g denied,* 415 U.S. 952, 94 S.Ct. 1477, 39 L.Ed.2d 568 (1974). That case involved an antitrust lawsuit against American Pipe and

Construction Company on behalf of a class of municipalities and state subdivisions. In holding that the class action complaint suspended the limitation period for intervenors, the Court stated that the class complaint supplied sufficient notice to the defendants of their potential classwide liability. Thus the policy behind statutes of limitations of apprising defendants of both the subject matter and the size of the prospective litigation was met, and the defendants would experience no prejudice. *Id.,* 414 U.S. at 555, 94 S.Ct. at 767.

In an action filed under Title VII, the Supreme Court in *Crown, Cork & Seal Company, Inc. v. Parker* extended this holding in two significant ways. *Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 354, 103 S.Ct. 2392, 2397, 76 L.Ed.2d 628 (1983). In that case, the plaintiff filed an EEOC charge and received a right-to-sue letter. He did not begin a federal court action for two more years, long after the 90–day limitation period contained in 42 U.S.C. § 2000e–5(f)(1) had expired. The plaintiff instituted his action immediately after the denial of class certification in a different action by another person which contained similar allegations. First, the Court held that *American Pipe* applies to charges filed under Title VII. *Crown, Cork & Seal,* 462 U.S. at 350 n. 3, 103 S.Ct. at 2395 n. 3. Second, the Court held that the tolling of a limitation period applies to putative class members who institute independent actions, not just to would-be intervenors in the underlying class complaint. *Id.,* 462 U.S. at 350, 103 S.Ct. at 2396. The suspension of the limitation period lasts for all putative class members until class certification is denied, at which time it begins to run again. *Id.,* 462 U.S. at 354, 103 S.Ct. at 2397–98.

The *Crown, Cork & Seal* Court based their extension of the *American Pipe* holding on several policy grounds. The Court observed that "there are many reasons why a class member, after the denial of class certification, might prefer to bring an individual suit rather than intervene." *Id.,* 462 U.S. at 350, 103 S.Ct. at 2396. Among those reasons, permission to intervene in the earlier filed action "might be refused for reasons wholly unrelated to the merits of the claim." *Id.,*

462 U.S. at 350, 103 S.Ct. at 2396. For example, permission to intervene might be refused for reasons related only to factors within the district court's discretion, such as for prevention of undue delay. *Id.,* 462 U.S. at 350 n. 4, 103 S.Ct. at 2396 n. 4. The Court rejected the suggestion that this tolling rule is inconsistent with the purposes served by statutes of limitations.

> Limitations periods are intended to put defendants on notice of adverse claims and to prevent plaintiffs from sleeping on their rights, but these ends are met when a class action is commenced. Class members who do not file suit while the class action is pending cannot be accused of sleeping on their rights; Rule 23 both permits and encourages class members to rely on the named plaintiffs to press their claims. And a class complaint notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment.

*Id.,* 462 U.S. at 352–53, 103 S.Ct. at 2397 (citations and internal quotations omitted).

In many ways, the situation before the Court in *Crown, Cork & Seal* is identical to that before us. There, in an independent action, a Title VII plaintiff based the suspension of his limitation period on an earlier filed Title VII action. Here, the Plaintiffs wish to base the suspension of their limitation period on Jefferson's earlier filed EEOC charge. There, the plaintiff did not participate as a joint plaintiff or as an intervenor in the proceedings in the earlier action. Here, the Plaintiffs were precluded from joining suit in Jefferson's action based on Judge Shadur's discretionary decision not to accept Jefferson's third amended complaint. There, the plaintiff would have become a class member had the class been certified. Here, the Plaintiffs would have become class members had Jefferson's putative class been certified. There, class certification was denied, and the plaintiff immediately instituted an independent action. Here, class certification was denied, and the Plaintiffs immediately instituted an independent action.

Nevertheless, before concluding that the holding in *Crown, Cork & Seal* applies to the present case, we must address three factual distinctions which exist between the present case and the situation before the Supreme Court. The first distinction is that the EEOC charges filed *pro se* by Jefferson were not denominated class charges, while the EEOC charge on which the plaintiff relied in *Crown, Cork & Seal* apparently was labeled a class charge. The second distinction is that here, the Plaintiffs want to suspend the limitation period of 300–days within which to file an EEOC charge, 42 U.S.C. § 2000e–5(e)(1), whereas in *Crown, Cork & Seal,* the plaintiff wanted to suspend the limitation period of 90–days within which to begin a federal action after receipt of a right-to-sue letter, 42 U.S.C. § 2000e–5(f)(1). The third distinction is that in the suit at bar, the later filing Plaintiffs seek to represent a class, whereas in *Crown, Cork & Seal,* the later filing plaintiff sought relief only on his own behalf. As the discussion below indicates, these distinctions do not remove the present scenario from the ambit of the *Crown, Cork & Seal* holding.

■■■ First, the explicit request to represent a class is not a necessary component of a classwide allegation. Jefferson made allegations in his EEOC charge "like or reasonably related to" classwide allegations and so put Metro Pier on notice of the substance and size of the potential classwide litigation. The scope of an EEOC charge limits the scope of the subsequent complaint. *Schnell-*

*baecher v. Baskin Clothing Co.,* 887 F.2d 124, 127 (7th Cir.1989). A plaintiff may allege in a Title VII complaint in federal court any claim of discrimination "like or reasonably related to the allegations of the [EEOC] charge and growing out of such allegations." *Babrocky v. Jewel Food and Retail Meatcutters,* 773 F.2d 857, 864 (7th Cir.1985). Therefore, a complaint may contain classwide allegations if they are "like or reasonably related to" the allegations contained in the underlying charge. *See Schnellbaecher,* 887 F.2d at 127–28.

■■■ Here, Jefferson's EEOC claim made classwide allegations, and so he was entitled to begin a federal action containing these allegations.[2] EEOC charges should be construed with the utmost liberality because they are usually filed *pro se* by uninformed complainants unfamiliar with the legal terminology behind the claims which they make. *See Greene v. Term City, Inc.,* 828 F.Supp. 584, 588 (N.D.Ill.1993) (Duff, J.). The July 22 charge contained the words, "I believe that Blacks are discriminated against as a class. . . ." (Pl.'s Ex. 20). The July 29 charge contained allegations of discriminatory disciplinary enforcement against Jefferson and of threats of discriminatory discharge against the "50 most senior employees (mostly black), to improve the seniority status of non-blacks." *(Id.).* These charges can only be read to allege facts implying classwide discriminatory enforcement of Metro Pier's disciplinary policies for the benefit of non-blacks and for the detriment of blacks.[3]

2. It is a separate question not before us whether a motion for class certification in Jefferson's action would have been properly granted. *Cf. Patterson,* 631 F.2d at 480.

3. Metro Pier argues that the Plaintiffs are collaterally estopped from relitigating the issue of what allegations Jefferson's EEOC charge might have contained. They base this argument on the bench rulings by Judges Shadur and Castillo. The Plaintiffs maintain that Metro Pier has not met its burden of showing collateral estoppel. They argue that Metro Pier would need to show 1) the issue sought to be precluded is the same as that involved in the prior action, 2) the issue was actually litigated, 3) the determination of the issue was essential to the final judgment, and 4) the party or parties against whom estoppel is being asserted were fully represented in the prior action. *Freeman v. United Coal Mining Co. v. OWCP,* 20 F.3d 289, 293–94 (7th Cir.1994).

We agree with the Plaintiffs. The issue before Judges Shadur and Castillo was whether to allow Jetun Jefferson to file a third amended complaint, a request fully within their discretion. Judge Shadur stated two reasons for not allowing the third amended complaint: concern about "distortion" of the limitation period, and concern about undue delay in Jefferson's impending trial. Judge Castillo added a third: disinclination to undo a previous judge's ruling. Moreover, Jefferson's request for leave to file a third amended complaint was pro forma. It contained a citation to only a single case. Jefferson did not file a reply to Metro Pier's response. (Def.'s Ex.s O, P). The issue of Title VII limitation periods was not directly before those courts, that issue was not actually litigated before those courts, and the concern over the limitation period was not the only basis for those courts' decisions not

Therefore, failure to label a class charge as such in the earlier filed complaint does not remove the present case from the ambit of the holding in *Crown, Cork & Seal. See, e.g., Anderson v. Montgomery Ward & Co., Inc.,* 631 F.Supp. 1546, 1549 (N.D.Ill.1986) (Duff, J.), *aff'd,* 852 F.2d 1008, 1017 (7th Cir.1988) (ADA class allegations found within EEOC charge not labeled as class allegations).

■ Second, the Seventh Circuit has held that it is the EEOC charge, not the federal complaint, that suspends the limitation period in classwide allegations under Title VII. *See McDonald v. United Air Lines, Inc.,* 587 F.2d 357, 361 (7th Cir.1978), *cert. denied,* 442 U.S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 303 *reh'g denied,* 444 U.S. 890, 100 S.Ct. 196, 62 L.Ed.2d 127 (1979) (quoting *Romasanta v. United Airlines, Inc.,* 537 F.2d 915, 918 n. 6 (7th Cir.), *aff'd sub nom. United Airlines, Inc. v. McDonald,* 432 U.S. 385, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1976)) (" 'The statute of limitations in Title VII actions is suspended when one member of the class initiates the grievance mechanism.' "). By making classwide allegations within an EEOC charge, a complainant "notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment." *American Pipe,* 414 U.S. at 555, 94 S.Ct. at 767. The Seventh Circuit recognized this principle when it based the class membership dates of a Title VII class action on the dates of two earlier independent EEOC charges that settled before completing the administrative process. *McDonald,* 587 F.2d at 361 n. 12. These earlier charges never blossomed into federal actions. Moreover, they were not denominated class charges. *Id.* at 361 n. 11. Nonetheless, they sufficed to toll the limitations period because they still gave the defendant notice that aggrieved employees were challenging a classwide policy. *Id.* at 361.

■ Accordingly, a Title VII plaintiff in a later action is allowed to establish an earlier limitation period by relying on "complainants who filed earlier than the date on which the class representative filed." *Allen,* 99 F.R.D. at 50.[4] Further, for the purpose of tolling the limitation period, "it is immaterial whether the earlier-filing complainant brought charges denominated as class charges or individual charges." *Id., citing McDonald,* 587 F.2d at 361 n. 11. As long as a defendant is "put on notice" that the earlier EEOC filing contained class allegations, and as long as the defendants face a likelihood of a classwide action later being maintained against them, an earlier filed charge tolls the limitation period for potential class members. *Paskuly v. Marshall Field & Co.,* 646 F.2d 1210, 1211 (7th Cir.), *cert. denied sub nom. Marshall Field & Co. v. Paskuly,* 454 U.S. 863, 102 S.Ct. 321, 70 L.Ed.2d 162 (1981); *McDonald,* 587 F.2d at 361. Therefore, in the Seventh Circuit, the *Crown, Cork & Seal* holding applies not only to suspend the 90–day limitation period following receipt of a right-to-sue letter, 42 U.S.C. § 2000e–5(f)(1), but also to suspend the 300–day limitation period for filing an initial EEOC charge alleging classwide injury, 42 U.S.C. § 2000e–5(e)(1).

■ Third, it is immaterial that the Plaintiffs here seek to represent a class while the plaintiff in *Crown, Cork & Seal* filed an action on his own behalf. The holding in *Crown, Cork & Seal* is based in part on the notification to the defendant of potentially numerous actions arising out of the original classwide allegations. *Crown, Cork & Seal,* 462 U.S. at 352–53, 103 S.Ct. at 2397. Here, Metro Pier cannot claim lack of notification that their discriminatory policy was the focus of classwide allegations. Jefferson's EEOC charges and the investigation arising from it encompassed scrutiny of records for numerous potential class members. The EEOC asked for records regarding the racial makeup of all janitorial employees. (Def.'s Ex. N). They also requested reports pertaining

---

to grant leave to file the third amended complaint.

**4.** Class representatives still have to comply with the Title VII administrative requirement of obtaining a right-to-sue letter from the EEOC in

order to establish eligibility to be a named Title VII plaintiff in a federal complaint. *Wakeen v. Hoffman House, Inc.,* 724 F.2d 1238, 1246 (7th Cir.1983).

to all terminations and reasons for termination for 1990 and documents pertaining to the disciplinary system. (Pl.'s Ex. 21). Also, the holding in *Crown, Cork & Seal* is based in part on the fact that plaintiffs in later actions are not sleeping on their rights when they rely on named plaintiffs to press their claims. *Crown, Cork & Seal,* 462 U.S. at 352–53, 103 S.Ct. at 2397. If a single plaintiff in the later action cannot be accused of sleeping on his rights, neither can the named plaintiffs in a later classwide complaint. "Rule 23 both permits and encourages class members to rely on the named plaintiffs to press their claims." *Id.* Therefore, the fact that the later action is a class action does not remove the present case from the ambit of the holding in *Crown, Cork & Seal.*

Accordingly, the Plaintiffs here may rely on Jefferson's earlier filed EEOC charge to establish their limitation period, and thus their class membership period. *See Movement for Opportunity and Equality,* 622 F.2d at 1248. The holding of *Crown, Cork & Seal* fully applies here. The tolling of Jefferson's limitation period in his classwide Title VII allegations applies to the Plaintiffs at bar who have instituted this independent action. By the date of Jefferson's second charge, Metro Pier had notice its disciplinary policy was under attack by a class of potential plaintiffs. Thus the opening date for class membership in the Title VII claims is October 2, 1990.

The same reasoning applies to the Plaintiffs' Section 1981 claims. Although the Court does not have before it Jefferson's second amended complaint, the Plaintiffs assert that it contains a claim for relief under Section 1981. (Pl.'s Br. at 3). The limitation period for Section 1981 claims is two years. *See Smith v. City of Chicago,* 951 F.2d 834, 837 n. 1 (7th Cir.1992). Jefferson's second amended complaint was filed on July 14, 1993. Therefore, the opening date for class membership in the Section 1981 claims is July 14, 1991.

## CONCLUSION

For the reasons stated above, this Court grants the motion to certify the Plaintiffs' class. The class membership opening date is October 2, 1990 for the Title VII claims and July 14, 1991 for the Section 1981 claims.